IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| FRONTIER WEST VIRGINIA INC. AND CITIZENS TELECOMMUNICATIONS COMPANY OF WEST VIRGINIA d/b/a FRONTIER COMMUNICATIONS OF WEST VIRGINIA,<br><br>PLAINTIFFS,<br><br>v.<br><br>GOVERNOR JAMES C. JUSTICE II, SOLELY IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF WEST VIRGINIA; CHAIRMAN MICHAEL A. ALBERT, SOLELY IN HIS OFFICIAL CAPACITY AS CHAIRMAN AND COMMISSIONER OF THE PUBLIC SERVICE COMMISSION OF WEST VIRGINIA; COMMISSIONER BROOKS F. MCCABE, JR., SOLELY IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE PUBLIC SERVICE COMMISSION OF WEST VIRGINIA; AND COMMISSIONER RENEE A. LARRICK, SOLELY IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE PUBLIC SERVICE COMMISSION OF WEST VIRGINIA,<br><br>DEFENDANTS. | CIVIL ACTION NO. 2:17-cv-03560 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Frontier West Virginia Inc. and Citizens Telecommunications Company of West Virginia d/b/a Frontier Communications of West Virginia (individually and collectively, "Frontier"), complain as follows against defendants Governor James C. Justice II, solely in his official capacity as Governor of the State of West Virginia; Chairman Michael A. Albert, solely in his official capacity as Chairman and Commissioner of the Public Service Commission of West Virginia ("PSC"); Commissioner Brooks F. McCabe, Jr., solely in his official capacity as

1

Commissioner of the PSC; and Commissioner Renee A. Larrick, solely in her official capacity as Commissioner of the PSC ("Defendants"):

### NATURE OF THE CASE

1. Effective July 7, 2017, a new West Virginia law allows third parties to perform work on Frontier's communications network, in some circumstances without so much as prior notice to Frontier. Under the new law, where a third party seeks to attach equipment to an electric utility pole and Frontier already has communications lines or other facilities on the pole, the third party may relocate or alter Frontier's facilities as it deems necessary. If the third party believes its work on Frontier's facilities would not cause or reasonably be expected to cause a customer outage, the third party need not notify Frontier in advance. The new law similarly would allow a third-party attacher to relocate or alter the facilities of an existing attacher on poles owned by Frontier.

2. Frontier seeks declaratory and permanent injunctive relief to restrain Defendants from enforcing this new West Virginia law. The law conflicts with and is preempted by the pole attachment regulations of the Federal Communications Commission ("FCC"). In addition, the new law violates the Contract Clause and the Fifth and Fourteenth Amendments of the United States Constitution.

### JURISDICTION AND VENUE

3. This action arises under the laws and Constitution of the United States, specifically 47 U.S.C. § 224, a provision of the Communications Act of 1934 as amended by the Telecommunications Act of 1996, and under the Supremacy and Contract Clauses, as well as the Fifth and Fourteenth Amendments, of the United States Constitution. The Court has federal question jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and equitable jurisdiction to enjoin unconstitutional action under *Ex Parte Young*, 209 U.S. 123 (1908).

4. The Court's authority to grant declaratory relief and related injunctive relief is based upon 28 U.S.C. §§ 2201-2202 because an actual controversy exists.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Frontier's claims arose in this judicial district and a substantial portion of Frontier's property impacted by the challenged West Virginia law is situated in this district.

## PARTIES

6. Frontier West Virginia Inc. and Citizens Telecommunications Company of West Virginia d/b/a Frontier Communications of West Virginia are West Virginia corporations with their principal place of business at 1500 MacCorkle Avenue, S.E., Charleston, West Virginia. At all relevant times, both corporations have been and are qualified to do business in West Virginia.

7. Defendant Governor James C. Justice II is the Governor of the State of West Virginia, and is sued solely in his official capacity. The chief executive power of the State is vested in the Governor, "who shall take care that the laws be faithfully executed." W. Va. Const., Art. VII, § 5.

8. Defendant Michael A. Albert is the Chairman and a Commissioner of the PSC and is sued solely in his official capacity. The PSC is "given power . . . to require [public utilities] to conform to the laws of [West Virginia]." W. Va. Code § 24-2-2(a).

9. Defendant Brooks F. McCabe, Jr. is a Commissioner of the PSC and is sued solely in his official capacity. The PSC is "given power . . . to require [public utilities] to conform to the laws of [West Virginia]." W. Va. Code § 24-2-2(a).

10. Defendant Renee A. Larrick is a Commissioner of the PSC and is sued solely in her official capacity. The PSC is "given power . . . to require [public utilities] to conform to the laws of [West Virginia]." W. Va. Code § 24-2-2(a).

## OPERATIVE FACTS AND FEDERAL REGULATION

### Joint Use and Occupancy of Utility Poles

11. Frontier is a wireline telecommunications carrier that provides telephone and other communications services in West Virginia. In order to provide these services, Frontier and its predecessors have invested hundreds of millions of dollars to construct, maintain, repair, replace, and operate an extensive communications network throughout the State.

12. A significant portion of Frontier's communications network in West Virginia consists of aerial communications facilities and attachments placed on telephone and electric utility poles. The majority of poles in West Virginia are owned by various electric utilities, with whom Frontier and other attachers have contracts for the joint use or occupancy of the poles. The remainder primarily are owned by Frontier.

13. In many instances, multiple providers (including electric utilities, communications providers, cable television providers and others) share space on a single pole. In the ordinary course of business, those providers work with each other and the pole owner to move or rearrange equipment, as necessary, to make room for a new provider seeking to attach to the pole. This process, commonly known as "make-ready" work, is the subject of contractual obligations and longstanding federal regulations. Those obligations and regulations include, among other things, provisions aimed at allowing all providers to share available pole space safely and effectively, without damaging or interfering with another provider's facilities or services.

### Regulation of Utility Pole Use or Occupancy under Federal Law

14. In 1978, Congress passed the Pole Attachment Act, codified at 47 U.S.C. § 224, as later amended by the Telecommunications Act of 1996. The Pole Attachment Act, as amended,

granted the FCC the power to regulate the rates, terms, and conditions for attachments on utility poles.

15. Under 47 U.S.C. § 224(c) a State may affirmatively displace or "reverse preempt" the FCC's jurisdiction by satisfying *three* strict statutory requirements.

16. *First*, Section 224(c)(2) requires that the State make the following certification to the FCC:

> Each State which regulates the rates, terms, and conditions for pole attachments *shall certify* to the Commission that –
>
> (A) it regulates such rates, terms, and conditions; and
>
> (B) in so regulating such rates, terms, and conditions, the State has the authority to consider and does consider the interests of the subscribers of the services offered via such attachments, as well as the interests of the consumers of the utility services.

47 U.S.C. § 224(c)(2) (emphasis added).

17. *Second*, Section 224(c)(3)(A) provides that "a State *shall not* be considered to regulate the rates, terms, and conditions for pole attachments *unless* the State has issued and made effective rules and regulations implementing the State's regulatory authority over pole attachments." *Id.* § 224(c)(3)(A) (emphasis added).

18. *Third*, Section 224(c)(3)(B) provides that:

> a State *shall not* be considered to regulate the rates, terms, and conditions for pole attachments . . . with respect to any individual matter, *unless* the State takes final action on a complaint regarding such matter –
>
> (i) within 180 days after the complaint is filed with the State, or
>
> (ii) within the applicable period prescribed for such final action in such rules and regulations of the State, if the prescribed period does not extend beyond 360 days after the filing of such complaint.

*Id.* § 224(c)(3)(B) (emphasis added).

19. West Virginia has satisfied *none* of these requirements to reverse preempt the FCC's jurisdiction over pole attachments.

**FCC Regulation of Pole Attachments in West Virginia**

20. 47 U.S.C. § 224(b) authorizes the FCC to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable" in all states that have not "reverse preempted" the FCC, including West Virginia.

21. In so regulating, the FCC has sought to "balance the needs of communications companies to deploy vital network facilities with the needs of utility pole owners, including the need to protect safety of life and the reliability of their own critically important networks." *In the Matter of Implementation of Section 224 of the Act*, 26 F.C.C.R. 5240, ¶ 7 (April 7, 2011) ("*FCC Pole Attachment Order*").

22. Among other things, the FCC's regulations entitle an entity with existing attachments, including Frontier, to receive prior written notice in the event a third party proposes to perform any make-ready work that would affect the entity's facilities. 47 C.F.R. § 1.1420(e). The FCC's regulations allow any entity with existing attachments up to 60 days (and potentially more, depending upon the type of existing facilities and number of affected poles) to modify its attachments to accommodate a new attacher. *Id*. Under the FCC's regulations, a new attacher may hire a contractor to complete the make-ready work itself only if the work has not been completed by the specified deadline. 47 C.F.R. § 1.1420(i).

23. In its recent Notice of Proposed Rulemaking, the FCC continues to examine its pole attachment regulations and to seek the proper balance of "the legitimate needs and interests of new attachers, existing attachers, utilities, and the public." *In the Matter of Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, Notice of Proposed

Rulemaking, Notice of Inquiry and Request for Comment, WC Docket 17-84 at ¶6 (Adopted: April 20, 2017; Released: April 21, 2017) ("2017 NPRM"). In considering changes to its existing regulations, the FCC specifically recognized "that speeding access to poles could raise meaningful concerns about safety and protection of existing infrastructure." *Id*.

## West Virginia House Bill 3093

24. On April 8, 2017, the West Virginia Legislature passed House Bill 3093 (attached as Exhibit A). The Governor signed it on April 26, 2017, and it has an effective date of July 7, 2017.

25. House Bill 3093 creates a new Chapter of the West Virginia Code (Chapter 31G. Broadband Enhancement and Expansion Policies). House Bill 3093 includes provisions establishing a Broadband Enhancement Council and authorizing the formation of cooperative associations to provide Internet access service. Those provisions are not at issue here and are not being challenged by Frontier in this lawsuit.

26. House Bill 3093's Article 4, however, would establish new terms and conditions of access to utility poles. Article 4 is limited in scope and is wholly severable from all remaining provisions of House Bill 3093.

27. Among other things, Article 4, § 31G-4-2(a) states that "[u]pon approval of an Attachment Application [by the pole owner], an Attacher may relocate or alter the attachments or facilities of any Pre-Existing Third Party User as may be necessary to accommodate an Attacher's attachment using Pole Owner approved contractors…" without the consent of, or in some cases, even notice to, the Pre-Existing Third Party User.

28. Article 4 only requires the new Attacher to provide prior notice to the Pre-Existing Third Party User if the new Attacher concludes its work would cause, or would reasonably be

7

expected to cause, a customer outage: "an Attacher will not effectuate a relocation or alteration of a Pre-Existing Third Party User's facilities that causes or would reasonably be expected to cause a customer outage without first providing forty-five days written notice to the Pre-Existing Third Party User." Article 4, § 31G-4-2(a).

29. Even where a relocation or alteration would cause or is expected to cause a customer outage, the new Attacher may relocate or alter the Pre-Existing Third Party User's facilities if the Pre-Existing Third Party User's does not transfer or rearrange its facilities within forty-five days from receipt of the notice: "In the event the Pre-Existing Third Party Users of such other facilities fail to transfer or rearrange their facilities within forty-five days from receipt of notice of relocation or alteration of a Pre-Existing Third Party User's facilities that causes or would reasonably be expected to cause a customer outage, an Attacher may undertake such work." Article 4, § 31G-4-2(b).

30. Accordingly, Article 4 permits the new Attacher to seize Frontier's property, and to alter or relocate Frontier's property, without Frontier's consent – and even without prior notice to Frontier in some cases – increasing the risk of loss of service to Frontier's customers, including, among other things, 9-1-1 or other emergency services.

31. Even where Frontier is the Pole Owner, Article 4 may allow new Attachers to relocate or alter Pre-Existing Third Party User's facilities on Frontier's poles without prior notice of the specific work to be performed.

32. Under the procedures set forth in Article 4, Frontier will be deprived of the opportunity to assess the potential for network disruption caused by the alteration or relocation of its facilities or of Third Party User's facilities, and to specify and oversee the work in order to

avoid or minimize any potential for harm to its network and other property – and ensure the continuity and quality of service to its customers.

33. In addition, as a result of those Article 4 procedures, in the event of network trouble during or after the new Attacher's work, Frontier may be hampered in locating and correcting that trouble. Either Frontier will not be notified at all of the location or nature of the new Attacher's work or, even where Frontier is entitled to notice, it may not know of the location and type of work until the new Attacher actually provides the notice of completion of the work, if ever.

34. The procedures specified by Article 4 provide substantially less protection for Frontier and its customers than the procedures specified by current contracts and by federal regulations.

35. Enforcement of Article 4 would inflict significant harm on Frontier and its customers, including, among other things, increasing the risk of interruptions and outages in Frontier's services because Article 4 authorizes third parties to perform work on Frontier's network without Frontier's authorization or oversight.

36. Many of the new Attachers are direct competitors of Frontier, and may have little or no incentive to avoid damaging Frontier's network facilities and other property.

37. Frontier's challenge to Article 4, as set forth in this Complaint, will not affect any remaining provisions of House Bill 3093.

**FIRST CLAIM FOR RELIEF:**
**FEDERAL PREEMPTION (SUPREMACY CLAUSE)**

**A. Express Preemption by 47 U.S.C. § 224**

38. Frontier hereby incorporates by reference the allegations of paragraphs 1 through 37, inclusive, as though fully set forth herein.

39. West Virginia, and specifically in House Bill 3093, has not satisfied *any* of the statutory requirements for its assertion of jurisdiction over the rates, terms, and conditions for pole attachments – nor does House Bill 3093 even purport to do so.

40. *First*, West Virginia has *not* certified to the FCC that it "regulate[s] rates, terms, and conditions for pole attachments." *See FCC Pole Attachment Order,* 26 FCC Rcd at 5371 (APPENDIX C "States That Have Certified That They Regulate Pole Attachments"). West Virginia's House Bill 3093's Article 4 seeks to regulate pole attachments to Frontier's and electric utilities' poles in the absence of any certification to the FCC.

41. *Second*, West Virginia has *not* certified that it "has issued and made effective rules and regulations implementing [its] regulatory authority over pole attachments, including a specific methodology for such regulation which has been made publicly available in the state." *Id.* No such rules or regulations exist, nor does House Bill 3093 otherwise comply with federal law.

42. *Third*, House Bill 3093's Article 4 has no provision for allowing complaints involving the rates, terms and conditions for pole attachments, including, among other things, complaints let alone requiring their resolution within 180 days.

43. Since House Bill 3093 satisfies *none* of the statutory conditions for reverse preemption of federal authority, 47 U.S.C. § 224 precludes West Virginia from regulating the rates, terms, and conditions of the pole attachments under the FCC's jurisdiction.

44. Federal law expressly preempts Article 4 and renders it invalid and unenforceable.

### B. Inconsistency with FCC Regulations

45. Frontier hereby incorporates by reference the allegations of paragraphs 1 through 44, inclusive, as though fully set forth herein.

46. In adopting its pole attachment regulations, the FCC acted upon a developed record and made findings regarding the reasonableness and appropriateness of its mandated procedures and timelines. In doing so, the FCC weighed and balanced various competing interests, including, among other things, the public interest in avoiding service outages and giving utilities and telecommunications carriers sufficient time to perform make-ready work to ensure safety and reliability.

47. House Bill 3093's Article 4 conflicts with the FCC's regulations, including, among other things, upsetting the balances struck by the FCC in crafting those regulations.

48. Article 4 is preempted by and rendered invalid and unenforceable by the FCC's regulations.

### C. Declaratory and Injunctive Relief

49. Frontier hereby incorporates by reference the allegations of paragraphs 1 through 48, inclusive, as though fully set forth herein.

50. Frontier will suffer imminent, irreparable harm that cannot be redressed by recovery of damages, including, among other things, Frontier will be forced to comply with a preempted state law, and its business and property would be subject to improper seizure and interference by competitors.

51. Preliminary and permanent injunctions will advance the public interest as defined by Congress and the FCC.

52. Any and all other prerequisites to preliminary and permanent injunctive relief, and to declarative relief, have been met.

53. Frontier is entitled to a judgment declaring Article 4 invalid and unenforceable, and to preliminary and permanent injunctions restraining Defendants from enforcing, or authorizing any third parties to act pursuant to, Article 4.

### SECOND CLAIM FOR RELIEF:
### VIOLATION OF THE CONTRACT CLAUSE OF THE
### UNITED STATES CONSTITUTION

54. Frontier hereby incorporates by reference the allegations of paragraphs 1 through 53, inclusive, as though fully set forth herein.

55. The Contracts Clause of the United States Constitution states in relevant part: "No State shall ... pass any ... law impairing the Obligation of Contracts." U.S. Const. art. I, § 10.

56. Frontier has existing contractual relationships with electric utilities and other Pole Owners in West Virginia that govern, among other things, the use of poles and the maintenance of Frontier's existing attachments and facilities on poles. Nothing in the contracts permits third parties to rearrange or transfer Frontier's attachments and facilities unilaterally, and certainly not without prior notice. Further, if a new Attacher does so, the Pole Owner and Frontier cannot ensure compliance with obligations under the contracts.

57. Frontier has existing contractual relationships with cable television providers and other attachers in West Virginia that govern, among other things, the use of Frontier's poles and the maintenance of existing attachments and facilities on Frontier's poles. Nothing in the contracts permits third parties to rearrange or transfer existing attachments and facilities of cable television providers or others unilaterally, and certainly not without prior notice. Further, if a new Attacher does so, the existing attacher and Frontier cannot ensure compliance with obligations under the contracts.

56. All these contracts are protected against impairment by the United States Constitution.

57. House Bill 3093's Article 4 substantially and unconstitutionally impairs the obligations under existing contracts.

58. Article 4 effectively nullifies important provisions of existing contracts and imposes new and unexpected limitations and conditions.

59. Article 4 is neither reasonable nor necessary to accomplish any legitimate public purpose.

60. Article 4 violates the Contracts Clause of the United States Constitution.

61. Frontier will suffer imminent, irreparable harm that cannot be redressed by recovery of damages, including, among other things, Frontier will be forced to comply with an unconstitutional law, and its obligations under contracts with other parties will be unconstitutionally impaired.

62. Preliminary and permanent injunctions are in the public interest.

63. Any and all other prerequisites to preliminary and permanent injunctive relief, and to declarative relief, have been met.

64. Frontier is entitled to a judgment declaring Article 4 invalid and unenforceable and to preliminary and permanent injunctions restraining Defendants from enforcing, or authorizing any third parties to act pursuant to, Article 4.

### THIRD CLAIM FOR RELIEF:
### VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

65. Frontier hereby incorporates by reference the allegations of paragraphs 1 through 64, inclusive, as though fully set forth herein.

66. The Fifth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides in relevant part: "No person shall be . . . deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use, without just compensation."

67. Frontier has a vested property interest in its physical network and private property in West Virginia, including its facilities attached to utility poles, and including Frontier's own poles.

68. House Bill 3093's Article 4 allows third parties, including Frontier's competitors, to trespass upon, handle, move, interfere with, and potentially damage Frontier's facilities attached to utility poles in West Virginia – thereby, among other things, destroying in whole or in part Frontier's investment and other property and its ability to use its facilities to provide service to its customers, without prior notice to Frontier and an opportunity to protect its property.

69. Article 4 constitutes an unlawful taking of Frontier's property without just compensation in violation of the United States Constitution.

70. Frontier will suffer imminent, irreparable harm that cannot be redressed by recovery of damages, including, among other things, Frontier will be forced to comply with an unconstitutional law, and its business and property will be subject to an unlawful and unconstitutional taking.

71. Preliminary and permanent injunctions are in the public interest.

72. Any and all other prerequisites to preliminary and permanent injunctive relief, and to declarative relief, have been met.

73. Frontier is entitled to a judgment declaring Article 4 invalid and unenforceable and to preliminary and permanent injunctions restraining Defendants from enforcing, or authorizing any third parties to act pursuant to, Article 4.

### PRAYER FOR RELIEF

WHEREFORE, Frontier prays for relief against Defendants as follows:

1. For a declaration and judgment that West Virginia House Bill 3093's Article 4 conflicts with and is preempted by federal law;

2. For a declaration and judgment that Article 4 violates the Contract Clause of the United States Constitution;

3. For a declaration and judgment that Article 4 violates the Fifth and Fourteenth Amendments to the United States Constitution;

4. For a permanent injunction restraining Defendants from enforcing, or authorizing any third parties to act pursuant to, Article 4; and

5. For such other and further relief as the Court may deem just and proper.

FRONTIER WEST VIRGINIA INC. AND CITIZENS TELECOMMUNICATIONS COMPANY OF WEST VIRGINIA D/B/A FRONTIER COMMUNICATIONS OF WEST VIRGINIA,

By counsel,

/s/ Thomas R. Goodwin
Thomas R. Goodwin (WV Bar #1435)
W. Jeffrey Vollmer (WV Bar #10277)
GOODWIN & GOODWIN LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
(304) 346-7000
trg@goodwingoodwin.com
wjv@goodwingoodwin.com

          Joseph J. Starsick, Jr. (WV Bar # 3576)
          FRONTIER COMMUNICATIONS
          1500 MacCorkle Avenue, S.E.
          Charleston, WV 25396
          (304) 344-7644
          joseph.starsick@ftr.com