**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| Frontier West Virginia Inc., Citizens Telecommunications Company of West Virginia d/b/a Frontier Communications of West Virginia, West Virginia Cable Telecommunications Association, Inc., on behalf of its members, and Communications Workers of America, AFL-CIO,<br><br>        Plaintiffs,<br><br>    v.<br><br>Chairman Michael A. Albert, solely in his official capacity as Chairman and Commissioner of the Public Service Commission of West Virginia; Commissioner Brooks F. McCabe, Jr., solely in his official capacity as Commissioner of the Public Service Commission of West Virginia; and Commissioner Renee A. Larrick, solely in her official capacity as Commissioner of the Public Service Commission of West Virginia,<br><br>        Defendants. | **Case Nos. 2:17-cv-03560 and 2:17-cv-03609** |

_____

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' JOINT MOTION FOR
SUMMARY JUDGMENT**
_____

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................1

SUMMARY OF ARGUMENT ............................................................................................4

STANDARD OF REVIEW ..................................................................................................5

ARGUMENT ........................................................................................................................5

I.      ARTICLE 4 IS PREEMPTED BY FEDERAL LAW ........................................................5

      A.      A State Law That Conflicts with Federal Law is Preempted...................................5

      B.      Article 4 Directly Conflicts with the Federal Regulatory Regime
              Established by Congress and the FCC ....................................................................7

              1.      Congress and the FCC Have Established a Detailed Federal
                      Regime Governing Make-Ready Procedures for Privately Owned
                      Utility Poles .............................................................................................8

              2.      Article 4 Squarely Conflicts with the Federal Regulatory Regime ..........12

II.     PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF..........................................17

CONCLUSION....................................................................................................................20

i

Frontier West Virginia Inc. and Citizens Telecommunications Company of West Virginia d/b/a Frontier Communications of West Virginia ("Frontier"), West Virginia Cable Telecommunications Association, Inc., on behalf of its members ("WVCTA"), and Communications Workers of America, AFL-CIO ("CWA") (collectively, "Plaintiffs"), hereby respectfully submit this memorandum of law in support of their motion for summary judgment.

## INTRODUCTION

This case presents a straightforward question of law:  whether Article 4 of West Virginia Code Chapter 31G ("Article 4") is preempted by federal law.  A federal district court in Tennessee recently considered the same question with respect to a functionally equivalent Nashville ordinance and found it federally preempted.  *See BellSouth Telecomms., LLC v. Metro. Gov't of Nashville & Davidson Cty.*, Nos. 16-2509, 16-2794, 2017 WL 5641145 (M.D. Tenn. Nov. 21, 2017).  The conflict between Article 4 and the federal regulatory regime is even more stark.  The Governor and Attorney General of West Virginia have conceded that only amendments to the existing federal regulations could "harmonize" the two conflicting regimes. Defs.' Mem. Supp. Mot. to Dismiss 4, No. 17-3609 consolidated with No. 17-03560 (Lead) (S.D.W. Va. Aug. 25, 2017), ECF No. 12.  And counsel for Defendants recently told the West Virginia Legislature that this Court would "likely" find Article 4 "unconstitutional because of federal preemption."  *Hearing on H. 4629 Before S. Comm. on Gov't Org.* at 9:24:47, 83rd Leg., 1st Sess. (W. Va. Mar. 7, 2018).  The reason why is clear:  Article 4 directly conflicts with the federal rules and timeline for pole attachments and must yield to federal law under the Supremacy Clause of the Constitution.

## BACKGROUND

This case is about the regulation of "pole attachments"—*i.e.*, cable and telecommunications facilities that are attached to utility poles and that serve as vital links in the

1

communications networks transmitting video programming, telephone, and Internet traffic across the country.  Communications providers that attach their lines and equipment to utility poles are known as "attachers."  Attachers enter into agreements with pole owners to attach their equipment to specific poles.  Although some attachers are also pole owners, many are not.  *See* Compl. for Declaratory and Injunctive Relief ("Frontier Compl.") ¶ 12, ECF No. 1.  It is common for multiple providers to have their equipment attached to any given pole.  Am. Compl. of WVCTA ("WVCTA Compl.") ¶ 2, ECF No. 56; Frontier Compl. ¶ 12.

The rates, terms, and conditions for attaching such equipment to utility poles are the subject of detailed and carefully calibrated federal regulations by the Federal Communications Commission ("FCC").  WVCTA Compl. ¶ 21; Frontier Compl. ¶ 14; Compl. of CWA ("CWA Compl.") ¶¶ 9, 11, ECF No. 23-1.  One area of particular focus for federal regulators is the process for modifying and rearranging existing attachments on utility poles to accommodate the installation of new attachments on poles, especially by a new entrant in the marketplace.  After a lengthy administrative proceeding, the FCC adopted detailed regulations in 2011 governing this so-called "make-ready" process for new attachments on privately owned utility poles.  *See* 47 C.F.R. § 1.1420; Report and Order and Order on Reconsideration, *Implementation of Section 224 of the Act; A National Broadband Plan for our Future*, 26 FCC Rcd. 5240 (Apr. 7, 2011) ("*2011 Pole Attachment Order*").  As explained further below, the federal regulations require pole owners to give existing attachers 60 days—and, in some cases, 105 days or more—to perform any necessary make-ready work on their own equipment.  *2011 Pole Attachment Order*, 26 FCC Rcd. at 5252 ¶ 22; *see also* 47 C.F.R. § 1.1420(e), (g)(3).  Only if the existing attacher fails to

move its own equipment during these time frames can new attachers perform the make-ready work themselves. *See* 47 C.F.R. § 1.1420(e).[1]

In 2017, West Virginia passed House Bill 3093. Article 4, entitled "Make-Ready Pole Access," purports to supplant the federal regulations by establishing a different "make-ready" process for utility poles in West Virginia. W. Va. Code § 31G-4 (2017). Article 4 provides that, "[u]pon approval of an Attachment Application [by the pole owner], an Attacher may relocate or alter the attachments or facilities of any Pre-Existing Third Party User as may be necessary to accommodate an Attacher's attachment." *Id.* § 31G-4-2(a). No prior notice to existing attachers is required. Existing attachers are given no opportunity to move their own equipment or provide any oversight. And existing attachers are not notified of the make-ready work until after it occurs. *Id.* § 31G-4-2(c) (providing for notice "[w]ithin thirty days of the completion of any relocation or alteration"). When a new attacher unilaterally determines that its work "would reasonably be expected to cause a customer outage," Article 4 requires 45 days' notice—after which time the new attacher can perform the work itself. *Id.* § 31G-4-2(a), (b).

Multiple lawsuits were filed in this Court challenging the constitutionality of Article 4. *See Frontier W. Va. Inc., et al. v. Justice, et al.*, No. 2:17-cv-03560 (S.D.W. Va. filed July 7, 2017); *W. Va. Cable Telecomms. Ass'n, Inc. v. Justice, et al.*, No. 2:17-cv-03609 (S.D.W. Va. filed July 14, 2017). The cases have since been consolidated, *see* Order Granting Joint Motion to

---

[1]   The federal regime also establishes a process for a State to certify to the FCC that it is asserting authority over pole attachments by comprehensively regulating all "rates, terms, and conditions for pole attachments," and by ensuring that its regulations "consider the interests of the subscribers of the services offered via such attachments, as well as the interests of the consumers of the utility services." 47 U.S.C. § 224(c)(2). West Virginia has not undertaken such comprehensive regulation of pole attachments and accordingly has not submitted any certification to the FCC. *See* Defs.' Answer to WVCTA Compl. ¶ 25, ECF No. 57; *see also 2011 Pole Attachment Order*, 26 FCC Rcd at 5371, App. C (listing certified states). Therefore, the FCC's pole attachment regulations apply in West Virginia.

Consolidate Cases, ECF No. 43, and this Court dismissed the Governor and Attorney General as Defendants, and allowed CWA to intervene as a Plaintiff, *see* Order, ECF No. 55.  The only Defendants remaining are the Commissioners of the West Virginia Public Service Commission ("PSC") and the only claim remaining is one of federal preemption.  *See id.*  At the hearing on the motions to dismiss, the parties agreed that discovery is not needed and that this purely legal claim can be decided on summary judgment.  Motions Hr'g Tr. 49:10-19, ECF No. 58.

## SUMMARY OF ARGUMENT

Article 4 directly conflicts with and is preempted by federal law.  The FCC's detailed regulatory scheme gives parties with existing attachments 60 days—and, in some cases, 105 days or longer—to perform make-ready work on their own equipment, and only permits third parties to move an existing attacher's equipment in the rare case that the work is not completed within those set timeframes.  By contrast, Article 4 provides encroaching attachers the right to perform make-ready work on the equipment of existing attachers immediately and with no prior notice in most cases.  Indeed, under Article 4, an existing attacher is not notified that an intervening third party has rearranged its equipment until *after* that work occurs.  Article 4 thereby transforms the FCC's narrow exception allowing a third party to move an existing attacher's equipment in rare cases (and only after ample notice) into the generally applicable rule.  Article 4 also largely dispenses with the first three stages of the FCC's four-stage process.  And it impermissibly supplants the careful balance struck by the FCC between encouraging the deployment of facilities and safeguarding the networks of existing attachers.  For all of these reasons, Article 4 is federally preempted.

As noted above, another federal district court recently found a similar Nashville ordinance preempted for much the same reasons.  The only relevant difference is that the Nashville ordinance provided for 15 days' notice in most cases, whereas Article 4 provides for

*zero* days' notice in most cases.  If anything, then, the case for federal preemption is even stronger here.  This Court should accordingly grant summary judgment for Plaintiffs, declare Article 4 invalid, and permanently enjoin Defendants from enforcing, applying, or otherwise giving effect to Article 4.

## STANDARD OF REVIEW

Summary judgment shall be entered when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The nonmoving party has the burden to "show that a genuine dispute does, in fact, exist," and "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  *Dash v. Mayweather,* 731 F.3d 303, 311 (4th Cir. 2013).

## ARGUMENT

## I.      ARTICLE 4 IS PREEMPTED BY FEDERAL LAW

As applied to privately owned utility poles, Article 4 is invalid because it directly conflicts with—and thus is preempted by—the FCC's specific and detailed regulations governing pole attachments in general and the make-ready process in particular.

### A.      A State Law That Conflicts with Federal Law is Preempted

Under the Supremacy Clause of the U.S. Constitution, "state law is naturally preempted to the extent of any conflict with a federal statute."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  This form of federal preemption—known as conflict preemption—arises "where it is impossible for a private party to comply with both state and federal law," or where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* at 372-73 (citation omitted); *see also Johnson v. Am. Tower, LLC,* 781 F.3d 693, 707 (4th Cir. 2015) ("Conflict preemption applies to state law 'when

compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (quoting *Pinney v. Nokia, Inc*., 402 F.3d 430, 457 (4th Cir. 2005)); *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 478 (4th Cir. 2014) (noting that "conflict preemption applies" when a state law "pose[s] an obstacle to federal purposes by interfering with the accomplishment of Congress's actual objectives" or "interfer[es] with the methods that Congress selected for meeting those legislative goals" (citation omitted)), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016).  Moreover, "[f]ederal regulations have no less pre-emptive effect than federal statutes."  *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984) (citation omitted).

To avoid a finding of conflict preemption, "'it is not enough to say that the ultimate goal of both federal and state law' is the same."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) (plurality) (citation omitted).  Rather, a state law "is preempted if it interferes with the methods by which the federal statute was designed to reach that goal."  *Id*. (plurality) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)).  Courts accordingly are "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."  *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994); *see also Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. v. Lockridge*, 403 U.S. 274, 287 (1971) (explaining that federal preemption extends to "specially designed procedures . . . to obtain uniform application of [Congress's] substantive rules," and observing that "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (citation omitted)).  In other words, "[t]he fact of a common end hardly neutralizes conflicting means."  *Crosby*, 530 U.S. at 379; *see also Columbia*

6

*Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 830 (4th Cir. 2010) (Preemption applies "where state law 'interferes with the *methods* by which the federal statute was designed to reach [its] goal.'") (quoting *Gade*, 505 U.S. at 103)).

**B.      Article 4 Directly Conflicts with the Federal Regulatory Regime Established by Congress and the FCC**

Congress and the FCC have established a carefully calibrated and detailed federal regime for the performance of make-ready work on privately owned utility poles.  Among other things, this regime (i) provides 60 days for an existing attacher to move its own equipment and considerably more time for larger orders; (ii) allows a third party to move an existing attacher's equipment only as a "remedy" and only in the rare case where the existing attacher failed to move its own equipment within the federally specified timeframe; (iii) outlines a specific and mandatory four-stage process for pole owners and new and existing attachers to follow; and (iv) strikes a careful balance between encouraging the deployment of facilities and safeguarding the networks of existing attachers.  Article 4, in marked contrast, (i) provides *zero* days for an existing attacher to move its own equipment (or 45 days when the encroaching attacher's actions "would reasonably be expected to cause a customer outage"), regardless of the size of the order; (ii) transforms the FCC's narrow exception allowing a third party to move an existing attacher's equipment only as a "remedy" into the generally applicable rule; (iii) largely dispenses with the first three stages of the FCC's four-stage process; and (iv) supplants the careful balance struck by the FCC with a lopsided preference for rushed deployment to the detriment of network safety.

1.    *Congress and the FCC Have Established a Detailed Federal Regime Governing Make-Ready Procedures for Privately Owned Utility Poles*

Section 224 of the Communications Act of 1934, as amended, grants the FCC authority to "regulate the rates, terms, and conditions for pole attachments."  47 U.S.C. § 224(b)(1).  The statute contains two provisions that are particularly relevant here.  Section 224(h) requires pole owners to give any entity with an existing attachment "a reasonable opportunity to add to or modify its existing attachment" before the owner modifies the pole.  *Id*. § 224(h).  Section 224(i) then provides that an existing attacher "shall not be required to bear any of the costs of rearranging or replacing its attachment, if such rearrangement or replacement is required as a result of an additional attachment or the modification of an existing attachment sought by any other entity (including the owner of such pole, duct, conduit, or right-of-way)."  *Id*. § 224(i).  The statute expressly authorizes the FCC to "prescribe by rule regulations to carry out the provisions" of Section 224.  *Id*. § 224(b)(2).

At first, the FCC relied on "case-specific adjudication" to effectuate and enforce the requirements of Section 224 "rather than adopting comprehensive access rules."  *See 2011 Pole Attachment Order*, 26 FCC Rcd. at 5242-43 ¶ 5.  But the FCC changed course in 2011.  The Commission explained that its "experience during the past 15 years has revealed the need to establish a more detailed framework to govern the rates, terms and conditions for pole attachments" and to "give necessary guidance to both pole owners and attachers."  *Id.* at 5242-43, 5250-51 ¶¶ 5, 21.  After an extensive notice and comment process, the FCC "adopt[ed] rules establishing a specific . . . four-stage timeline for attachment to poles, with a maximum timeframe of up to 148 days for completion of all four stages."  *Id*. at 5243-44 ¶ 8; *see id*. at 5242-43 ¶ 5 (noting the "substantial record from numerous commenters" and subsequent "workshops and other forums" with "stakeholders" and "state commission representatives").

8

The four-stage timeline "begins to run after the requester submits a complete application" to the pole owner. *Id.* at 5250 ¶ 19.

The first stage is a "survey phase," during which "the pole owner conducts an engineering study to determine whether and where attachment is feasible, and what make-ready is required." *Id.* at 5252 ¶ 22; *see also* 47 C.F.R. § 1.1420(c). The second stage is an "estimate" phase, in which the pole owner must "provide[] an estimate of the make-ready charges" after "receiving the results of the engineering survey." *2011 Pole Attachment Order*, 26 FCC Rcd. at 5252 ¶ 22; *see also* 47 C.F.R. § 1.1420(d). Third is the "acceptance" stage, in which the entity seeking to attach new equipment must "approve the estimate" of the cost of make-ready work "and provide payment." *2011 Pole Attachment Order*, 26 FCC Rcd. at 5252 ¶ 22; *see also* 47 C.F.R. § 1.1420(d)(2).

The fourth and final stage is the "make-ready" phase, in which the pole owner must send notice to existing attachers of the "need[]" to perform make-ready work to accommodate the new attacher, and existing attachers "may modify" their own equipment "no later than 60 days" after receiving such notice. *2011 Pole Attachment Order*, 26 FCC Rcd. at 5252 ¶ 22; *see also* 47 C.F.R. § 1.1420(e); 26 FCC Rcd. at 5253, Table 1 (describing pole owner's "[d]uty" to "[g]ive existing attachers 60 days['] notice"). The FCC anticipated that, "[i]n most cases, any required make-ready work will be completed within this period" by the existing attachers. *2011 Pole Attachment Order*, 26 FCC Rcd. at 5252 ¶ 22. But the FCC also recognized that even 60 days would not provide a sufficient window for an existing attacher to move its own equipment in certain cases. *Id.* at 5270 ¶ 63. Accordingly, the Commission added "45 days to the make-ready period[]" for "larger orders up to the lesser of 3000 poles or 5 percent of the utility's total poles in a state," and provided that, for orders that exceed these thresholds, the parties "shall negotiate

in good faith" regarding an even more extended timeline for the existing attacher to perform make-ready work on its own equipment. 47 C.F.R. § 1.1420(g)(3)-(4).

In those rare cases where "existing attachers have not moved their facilities within 60 [or 105] days of notification," the FCC provided a "remedy": then, and only then, "the utility or the [new] attacher may move [existing attachers'] facilities for them." *2011 Pole Attachment Order*, 26 FCC Rcd. at 5244, 5258 ¶¶ 8, 32. The Commission recognized that this was not a risk-free proposition and that it needed "to ensure that safety and network integrity are preserved at all costs." *Id*. at 5265 ¶ 49. The FCC accordingly required certain safeguards including, *inter alia*, the "opportunity for a utility representative to accompany and consult with the attacher and its contractor prior to commencement of any make-ready work by the contractor." *Id*.

This carefully calibrated regime—and the make-ready process in particular—was designed to strike a "balance between encouraging deployment of facilities and safeguarding the network[s]" of existing providers. *Id*. at 5269-70 ¶ 61. The FCC "recognize[d]" the "legitimate concerns" expressed by "pole owners and other parties" that would be "affected by additional attachments," the "desire to minimize disruption to [pole owners] and existing attachers," and the fact that "competent performance of . . . make-ready concerns not only utilities but also existing attachers and the general public, all of which rely on utility poles for delivery of vital services." *Id*. at 5243, 5267 ¶¶ 6, 53. And the Commission sought to "balance the needs of communications companies to deploy vital network facilities with . . . the need to protect safety of life and the reliability" of "critically important networks." *Id*. at 5243 ¶ 7.

The 60-day make-ready period in particular was the subject of considerable discussion, and was ultimately adopted based on voluminous evidence indicating that 60 days is a "workable timeframe." *Id*. at 5258 ¶ 32. The FCC pointed to "[t]he successful experiences of several

utilities *and* attachers" as support for "the pragmatism of selecting this [60-day] model"; cited submissions showing that utilities and attachers typically "need 60 days to perform make-ready," especially in situations where "multiple parties must be sequenced to perform make-ready"; and noted that some parties indicated that "requests for more than 200 attachments may require 60 days or more." *Id*. The 60-day period was also familiar to the Commission and the regulated parties, and it implemented Congress's directive in Section 224(h) requiring pole owners to give existing attachers a "reasonable opportunity" to move their own equipment. Notably, the FCC had "long interpreted" that requirement "to mean that a 'utility shall provide a cable television system operator or telecommunications carrier *no less* than 60 days written notice prior to removal of facilities.'" *Id*. at 5257-58 ¶ 31 (emphasis added) (quoting 47 C.F.R. § 1.1403(c), and citing First Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd. 15,499, 16,094-96 ¶¶ 1207-09 (1996)). By ensuring that existing attachers in the make-ready context continued to receive 60 days to move their own equipment (for smaller orders), the FCC was able to "synchronize make-ready" with its prior rules and with the statute. *2011 Pole Attachment Order*, 26 FCC Rcd. at 5257-58 ¶ 31.

Some commenters in the FCC proceeding had argued that the Commission should adopt a shorter baseline period (although, tellingly, no party argued for any less than 30 days, let alone no notice at all, and all parties appeared to recognize that more time would be needed for larger orders). *See id*. at 5258 ¶ 32. Specifically, at least one commenter urged the Commission to adopt a 45-day period. *See id*. at 5258 ¶ 32 & n.97. But the FCC expressly rejected that

proposal after finding that 45 days would often be inadequate to complete larger make-ready requests or requests involving "complicating factors." *Id*. at 5258 ¶ 32.[2]

## 2.    *Article 4 Squarely Conflicts with the Federal Regulatory Regime*

Like the Nashville ordinance—indeed, to an even greater degree—Article 4 directly conflicts with this binding federal regulatory scheme. Article 4 "stands as an obstacle to the accomplishment and execution of [the federal regime's] full purposes and objectives," *Crosby*, 530 U.S. at 373 (citation omitted), and, in some respects, it is "impossible" to comply with both, *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013).

*First*, Article 4's make-ready procedures are starkly inconsistent with those established by the FCC. In most cases, Article 4 authorizes third parties to perform make-ready work on existing attachers' equipment immediately and without providing existing attachers any opportunity to move their own equipment. W. Va. Code § 31G-4-2(a). This rule is completely at odds with the 60 to 105 days' notice set forth in the FCC's rules. *See* 47 C.F.R. § 1.1420(e). Even Article 4's 45-day period—which applies only when the new attacher unilaterally

---

[2]    The FCC issued a Notice of Proposed Rulemaking ("NPRM") on whether to amend the agency's regulations governing pole attachments, including the federal make-ready timeframes. *See* Notice of Proposed Rulemaking, Notice of Inquiry, and Request for Comment, *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, 32 FCC Rcd. 3266 (2017). Throughout the NPRM, the FCC repeatedly emphasized the need to balance the interest in efficient deployment of new network facilities with the need to ensure the safety and integrity of existing networks. *See, e.g.*, *id*. at 3268 ¶ 6 ("[W]e recognize that speeding access to poles could raise meaningful concerns about safety and protection of existing infrastructure. We intend to work toward an approach that facilitates new attachments without creating undue risk of harm."); *id*. at 3272 ¶ 18 ("We note that in crafting the pole attachment timeline adopted in 2011, the Commission sought to strike a balance between the goals of promoting broadband infrastructure deployment by new attachers and safeguarding the reliability of existing networks."). Moreover, the proposed rule—which has yet to be adopted—would still provide for 30 days' notice for smaller orders and 75 days' notice for larger orders, and encroaching attachers would still be permitted to move an existing attacher's equipment as a remedy only if the existing attacher failed to meet the applicable deadline. *See id*. at 3311, App'x A.

concludes its actions "would reasonably be expected to cause a customer outage," W. Va. Code § 31G-4-2(a)—is shorter than the FCC's notice periods.  While this provision contemplates that existing attachers could perform the necessary work on their own equipment during those 45 days, that window would provide less time than federal regulations require—particularly for larger orders.

In *BellSouth Telecommunications*, the district court held that the Nashville ordinance's "compressed deadline[s]" for allowing existing attachers to perform make-ready work on their own equipment stood "as a direct obstacle to the objective expressed by the FCC."  2017 WL 5641145, at *6.  The Nashville ordinance provided existing attachers 15 days in most instances to perform make-ready work—a period, the court noted, that was "considerably shorter" than the "deadlines considered, but expressly rejected, by the FCC."  *Id*.  By the same logic, Article 4's provision of *no* notice at all in most instances is plainly preempted.

Given the FCC's rejection of a 45-day notice period, *see 2011 Pole Attachment Order*, 26 FCC Rcd. at 5258 ¶ 32, and its determination that considerably more time is needed for larger orders, the lack of *any* prior notice in most cases and the curtailed 45-day notice period in certain circumstances (which applies regardless of the size of the order) "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives" of the FCC's chosen procedures governing the make-ready process.  *Crosby*, 530 U.S. at 373 (citation omitted); *see also Gade*, 505 U.S. at 92-94, 103-04 (finding state law preempted because it imposed threshold conditions on workers' ability to handle hazardous waste that differed from threshold conditions imposed under federal law).  Indeed, even more than an obstacle, Article 4 makes compliance with both federal and state law impossible.  A pole owner cannot simultaneously notify an

13

existing attacher that it has 60 days to move its own equipment and, at the same time, allow a third party to move that equipment on Day 1.

*Second*, Article 4 "turns the FCC's regulatory regime on its head by taking a narrow exception and transforming it into the default rule." *BellSouth Telecomms.*, 2017 WL 5641145, at *6. As noted above, the FCC provided that a third party would be permitted to move an existing attacher's equipment only as a "remedy" in the rare event that the existing attacher failed to move its equipment within the 60-day (or 105-day) notice period. *See 2011 Pole Attachment Order*, 26 FCC Rcd. at 5252 ¶ 22 (noting that, "[i]n most cases, any required make-ready work will be completed [by existing attachers] within th[e] period" established under the rules). Yet, under Article 4, third-party self-help is the default rule. Article 4 allows encroaching attachers to move existing attachers' equipment on their own, without the existing attachers' consent or oversight, with no prior notice in many instances, and using contractors not approved by existing attachers or subject to their required standards. *See* W. Va. Code § 31G-4-2. As in Nashville, this inversion of the FCC's process presents a further basis for conflict preemption.

*Third*, Article 4 largely dispenses with the other three stages of the FCC's four-stage process for service providers seeking to attach their equipment to utility poles. Article 4 does not contemplate an engineering survey initiated by the pole owner to determine whether further attachments are feasible and to assess what make-ready work might be required. *Cf. 2011 Pole Attachment Order*, 26 FCC Rcd. at 5254-55 ¶¶ 24-25; 47 C.F.R. § 1.1420(c). Article 4's procedures do not require a pre-installation estimate of the cost of make-ready work. *Cf. 2011 Pole Attachment Order*, 26 FCC Rcd. at 5255-56 ¶¶ 26-28; 47 C.F.R. § 1.1420(d). And Article 4 does not allow for any pre-installation payment of those estimated costs. *Id.* Instead, Article 4

provides that the new attacher need only submit an "[a]pplication" to the pole owner and that immediately "[u]pon approval" of that application, the new attacher "may relocate or alter the attachments or facilities of any" existing attacher.  W. Va. Code § 31G-4-2(a).  Under Article 4, neither pole owners nor encroaching attachers have any duty to inform existing attachers when such an application has been filed or even approved.  Article 4 merely requires that encroaching attachers notify the existing attachers "[w]ithin thirty days of the completion of any relocation or alteration," and provide a report with basic information about the work already performed.  *Id.* § 31G-4-2(c).  Although Article 4 grants the existing attacher a right to inspect the third-party's work after-the-fact, it requires the encroaching attacher to pay for repairs only if the work fails to conform to standards or requirements established by the *pole owner.  Id.* § 31G-4-2(d)-(e).

In *BellSouth Telecommunications*, the challenged ordinance was similarly "silent on and largely dispense[d] with the first three stages of the FCC's four-stage timeline for processing pole attachment requests."  2017 WL 5641145, at *6.  The court held that the ordinance did not simply provide "another avenue" for performing make-ready work that could operate in tandem with the FCC's regime, but rather "completely disregard[ed] the carefully calibrated procedure adopted by the FCC."  *Id.*  Article 4's disregard for the first three stages of the FCC's four-stage process likewise presents an impermissible obstacle to the accomplishment of the FCC's objectives.  *See Verizon N., Inc. v. Strand,* 309 F.3d 935, 941 (6th Cir. 2002) (finding preemption where procedure under state law for negotiating interconnection agreements "completely bypasses and ignores the detailed process for interconnection set out" under federal law).

*Fourth*, Article 4 overrides the FCC's policy choices on how best to promote the deployment of new network equipment and protect the integrity of existing networks at the same time.  As noted above, the FCC's pole attachment regulations—and the Commission's make-

ready rules in particular—are designed to maintain a careful "balance between encouraging deployment of facilities and safeguarding the network." *2011 Pole Attachment Order*, 26 FCC Rcd. at 5269-70 ¶ 61; *see id*. at 5243, 5267 ¶¶ 6-7, 53. The FCC struck this balance based on substantial evidence indicating that the chosen framework provides a "workable timeframe that many utilities can meet." *Id*. at 5258 ¶ 32. As with the Nashville ordinance, Article 4 "ignores one-half of the equation considered by the FCC" and disrupts this careful balance, *BellSouth Telecomms.*, 2017 WL 5641145, at *6—enabling third parties to move existing attachers' equipment with no prior notice in most cases (and with only 45 days' notice when the encroaching attacher unilaterally concludes that the work would reasonably be expected to cause an outage), thus reflecting a skewed preference for hasty deployment at the expense of network safety. West Virginia cannot substitute its judgment on these matters for the FCC's; it is preempted from "interfer[ing] with the methods by which the federal statute was designed to reach" its asserted goals. *Gade*, 505 U.S. at 103 (citation omitted); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 501 (1996) (distinguishing, for preemption purposes, a case in which the federal government had "weighed the competing interests relevant to the particular requirement in question" and "reached an unambiguous conclusion about how those competing considerations should be resolved"); *BellSouth Telecomms.*, 2017 WL 5641145, at *6 ("[M]ethod and means are within the ambit of preemption."). Article 4 "directly interfer[es] with the methods adopted by the FCC to balance between deployment of facilities and safeguarding the network." *Id.* at *7.[3]

---

[3] The FCC's Office of General Counsel filed a Statement of Interest in a Kentucky case, stating that "[o]ne-touch make-ready policies directly advance" the same "goals" as the FCC pole attachment regulations. *See* Statement of Interest at 6, *BellSouth Telecomms., LLC v. Louisville/Jefferson Cty. Metro. Gov't*, No. 3:16-cv-00124-TBR (W.D. Ky. Oct. 31, 2016), Dkt. 68-1. The principal focus of that filing is an issue not presented here: whether reverse preemption applied because Kentucky (unlike Tennessee and West Virginia) filed a certification

For all these reasons, Article 4 directly conflicts with and is preempted by the federal regulatory regime governing pole attachments.  This Court should accordingly grant summary judgment for Plaintiffs and declare Article 4 invalid.

## II.     PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

In addition to a declaration and judgment that Article 4 is invalid under the Supremacy Clause, Plaintiffs are entitled to a permanent injunction prohibiting Defendants from enforcing, applying, or otherwise giving effect to Article 4.  *See, e.g.*, *EQT Prod. Co. v. Wender*, 870 F.3d 322, 337 (4th Cir. 2017) (affirming district court's decision to permanently enjoin county ordinance preempted by federal law); *Verizon N.*, 309 F.3d at 937 (affirming district court's decision permanently enjoining state law preempted by federal communications law); *BellSouth Telecomms.*, 2017 WL 5641145, at *18 (granting permanent injunction barring defendants from applying ordinance preempted by FCC make-ready regulations).  The "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action."  *Armstrong v. Exceptional Child Care Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).  A court may issue a permanent injunction when the plaintiff demonstrates "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  All four elements are met in this case.

---

and purportedly opted out of the federal regulatory regime.  Notably, the FCC did not participate in the Nashville case, and the Nashville court did not rely on the Kentucky filing.

On the first and second elements, Article 4 exposes Plaintiffs to irreparable harm that monetary damages would be inadequate to address.  A loss of constitutional protections can constitute irreparable injury in and of itself.  *Legend Night Club*, 637 F.3d at 302 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J. 2013) (holding that enactment of a law "in violation of the Supremacy Clause, alone, likely constitutes an irreparable harm requiring the issuance of a permanent injunction"), *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013).  And Plaintiffs will face other forms of irreparable harm as well.

The opportunity for WVCTA members and Frontier to move their own equipment during the make-ready period provided by the FCC's rules is essential to those existing attachers' ability to safeguard their equipment and to ensure the efficient and reliable operation of their networks.  *See 2011 Pole Attachment Order*, 26 FCC Rcd. at 5243, 5267, 5270-71 ¶¶ 6-7, 53, 61 (finding that a 60-day period is critical for "safeguarding the network[s]" of existing attachers and is designed to "minimize disruption to . . . existing attachers" and to ensure the "reliability" of existing networks).  By permitting third parties to move critical equipment with no prior notice to an existing attacher, Article 4 substantially increases the risk that an attachment will be damaged or modified incorrectly, disrupting essential communication networks.  That risk is particularly acute for the vast majority of WVCTA members who do not own the poles to which their equipment is attached (WVCTA Compl. ¶ 14), because Article 4 does not afford those existing attachers any opportunity to approve the third-party contractors or to supervise their work in an effort to minimize disruption to their networks.   W. Va. Code § 31G-4-2(a) (authorizing encroaching attachers to perform make-ready work using a "Pole Owner[-]approved

contractor[]").  Article 4 thus exposes WVCTA members and Frontier to a heightened risk of harm to their facilities and disruption to their networks.

Service outages caused by encroaching attachers will cause significant harm to customer goodwill and to the reputations of WVCTA members and Frontier.  CWA members would also be injured because work assigned to its members under the collective bargaining agreement between CWA and Frontier would be performed by third parties, and because CWA workers would be forced to operate in dangerous conditions around attachment work incorrectly performed by those third parties.  *See* CWA Compl. ¶ 16; CWA's Mem. Supp. Mot. to Intervene at 5, ECF No. 24.  Those harms are irreparable because sovereign immunity will prevent Plaintiffs from recovering any monetary damages from Defendants.  *See Children's Hosp. of the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672, 690 (E.D. Va. 2017) ("While 'as a general matter' monetary loss is not irreparable unless it threatens a business's existence, where a plaintiff cannot recover damages due to the defendant's sovereign immunity, 'any loss of income suffered by a plaintiff is irreparable *per se*.'" (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008)); *see also Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1251 (10th Cir. 2001); *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).  But even if damages were available, they would not adequately compensate Plaintiffs for these injuries.  *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (holding that "the threat of a permanent loss of customers and the potential loss of goodwill" constitutes irreparable harm), *abrogated on other grounds by Winter v. Natural Res. Defense Council, Inc.,* 555 U.S. 7 (2008); *Columbia Gas Transmission, L.L.C. v. Robert Borror Logging, L.L.C.*, No. 2:12-CV-39, 2012

19

WL 2294870, at *2 (N.D.W. Va. June 15, 2012) (finding that potential "serious bodily injury or death" constituted "a great likelihood of irreparable harm").

On the third and fourth elements, the balance of hardships and public interest both militate strongly in favor of a permanent injunction. Defendants would suffer no hardship if this Court were to enjoin the enforcement, application, or effect of this unlawful statute. *Cf. Chamber of Commerce of the U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (explaining that a governmental body "does not have an interest in enforcing a law that is likely constitutionally infirm"). The FCC's careful balancing of the interests of new and existing attachers adequately protects the interests of service providers and consumers alike. The FCC is also engaged in an ongoing review of its make-ready rules (*see supra* note 2), affording Defendants an opportunity to propose any revisions to the federal regime they deem warranted. And the public interest likewise weighs in favor of enjoining an unconstitutional law. *Nat'l City Bank of Ind. v. Turnbaugh*, 367 F. Supp. 2d 805, 822 (D. Md. 2005) ("Once it is determined that the state laws are preempted by federal law, the harm the state may suffer if its laws are not enforced becomes irrelevant. Rather, 'the public interest will perforce be served by enjoining the enforcement of invalid provisions of state law.'" (citation omitted)), *aff'd,* 463 F.3d 325 (4th Cir. 2006).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for Plaintiffs, declare Article 4 to be federally preempted and invalid as applied to privately owned utility poles, and enjoin Defendants from enforcing, applying, or otherwise giving effect to Article 4.

Dated: April 2, 2018                    Respectfully submitted,

                                        */s/ Richard L. Gottlieb*
                                        Richard L. Gottlieb (WV Bar #1447)
                                        Spencer D. Elliott (WV Bar #8064)
                                        LEWIS GLASSER PLLC
                                        BB&T Square Suite 700
                                        300 Summers Street
                                        Charleston, West Virginia 25301
                                        (304) 345-2000
                                        E-mail: rgottlieb@lewisglasser.com
                                        E-mail: selliott@lewisglasser.com

                                        Matthew A. Brill (*pro hac vice*; DC Bar #456680)
                                        Melissa Arbus Sherry (*pro hac vice*; DC Bar #497787)
                                        Matthew T. Murchison (*pro hac vice*; DC Bar #987965)
                                        LATHAM & WATKINS LLP
                                        555 Eleventh Street NW, Suite 1000
                                        Washington, DC 20004
                                        (202) 637-2200
                                        E-mail: matthew.brill@lw.com
                                        E-mail: melissa.sherry@lw.com
                                        E-mail: matthew.murchison@lw.com

                                        *Attorneys for Plaintiff West Virginia Cable*
                                        *Telecommunications Association, Inc.*

                                        */s/ W. Jeffrey Vollmer*
                                        Thomas R. Goodwin (WV Bar #1435)
                                        W. Jeffrey Vollmer (WV Bar #10277)
                                        GOODWIN & GOODWIN LLP
                                        300 Summers Street, Suite 1500
                                        Charleston, WV 25301
                                        (304) 346-7000
                                        E-mail: trg@goodwingoodwin.com
                                        E-mail: wjv@goodwingoodwin.com

                                        Joseph J. Starsick, Jr. (WV Bar # 3576)
                                        FRONTIER COMMUNICATIONS
                                        1500 MacCorkle Avenue, S.E.
                                        Charleston, WV 25396
                                        (304) 344-7644
                                        E-mail: Joseph.starsick@ftr.com

                                        *Attorneys for Plaintiff Frontier West Virginia Inc. and*
                                        *Citizens Telecommunications Company of West Virginia*

*d/b/a Frontier Communications of West Virginia*

*/s/ Vincent Trivelli*

Vincent Trivelli, Esq. (WV Bar # 8015)
The Law Office of Vincent Trivelli, PLLC
178 Chancery Row
Morgantown, West Virginia 26505
(304) 291-5223
E-mail: vmtriv@westco.net

*Attorney for Intervenor Plaintiff Communications*
*Workers of America, AFL-CIO*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

|  |  |
|---|---|
| Frontier West Virginia Inc., Citizens Telecommunications Company of West Virginia d/b/a Frontier Communications of West Virginia, West Virginia Cable Telecommunications Association, Inc., on behalf of its members, and Communications Workers of America, AFL-CIO,<br><br>         Plaintiffs,<br><br>    v.<br><br>Chairman Michael A. Albert, solely in his official capacity as Chairman and Commissioner of the Public Service Commission of West Virginia; Commissioner Brooks F. McCabe, Jr., solely in his official capacity as Commissioner of the Public Service Commission of West Virginia; and Commissioner Renee A. Larrick, solely in her official capacity as Commissioner of the Public Service Commission of West Virginia,<br><br>         Defendants. | **Case Nos. 2:17-cv-03560 and 2:17-cv-03609** |

## <u>CERTIFICATE OF SERVICE</u>

I, Richard L. Gottlieb, counsel for Plaintiff West Virginia Cable Telecommunications Association, Inc., certify that, on April 2, 2018, a copy of the foregoing *Memorandum of Law in Support of Plaintiffs' Joint Motion for Summary Judgment* was served electronically through the Court's CM/ECF system on all ECF-registered counsel.

*/s/ Richard L. Gottlieb*
Richard L. Gottlieb